**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| THE STATE OF WASHINGTON,<br><br>                    Respondent,<br>     v.<br><br>JULIUS T. BOOTH,<br><br>                  Appellant. | No. 82751-1-I<br><br>DIVISION ONE<br><br>PUBLISHED OPINION |

SMITH, A.C.J. — Julius Booth led the police in a half-hour long, high-speed pursuit while his partner, who had a no-contact order against Booth, and two children were in the car. He was convicted of attempting to elude a police officer and felony violation of a no-contact order. He contends on appeal that the Washington Constitution's article I, sections 21 and 22 create a right to the use of peremptory strikes during jury selection that was violated when the trial court erroneously denied his motion to dismiss a potential juror for cause. He also asserts that the trial court's ex parte dismissal of a seated juror who was ill violated his rights to be present at critical stages of trial and have counsel at critical stages of trial. He finally argues that his two convictions should merge because they were based on the same act.

Concluding that there is no right to peremptory strikes in criminal trials under the Washington Constitution, that the dismissal of the ill juror was an

administrative matter rather than a critical stage, and that the relevant statutes indicate the legislature's intent to punish Booth's offenses separately, we affirm.

FACTS

Events leading to Arrest

Julius Booth, his girlfriend Jorden Gaytan-Roybal, and her two children, of whom Booth is the father of one, were living in their car in December 2020. Though they lived together, Booth was prohibited from contacting Gaytan-Roybal by a no contact order. One afternoon, one of the children vomited in the car, leading Booth and Gaytan-Roybal to argue.

A King County Sheriff detective, Koby Hamill, happened to pass by. He testified at trial that Gaytan-Roybal appeared "visibly upset," was slamming her hand against the side of the car, and was repeatedly screaming "[g]ive me my baby." Hamill stated that Booth angrily exited the car, approached Gaytan-Roybal, and demanded she get back in the vehicle. Hamill testified that Booth forced Gaytan-Roybal toward the car with his body as she resisted, eventually pushing her inside. In her testimony at trial, Gaytan-Roybal denied that Booth used force.

With Gaytan-Roybal in the car and Hamill following, Booth began to drive, eventually getting on Interstate 5. Booth's driving was jerky and erratic, leading Hamill to believe there was "some activity taking place in the car." Hamill called for other officers to assist, and they arrived with their emergency lights activated. While they were attempting to pull Booth over, he instead crossed "all the way over" the highway and accelerated away.

The chase lasted for nearly half an hour.  The officers pursued Booth and called for the assistance of Guardian One, a police helicopter.  Booth, travelling faster than the cars around him, repeatedly crossed from one side of the highway to another.  When he and his pursuers hit traffic, Booth drove on the shoulder of the highway.  After some time, he aggressively crossed traffic and exited onto South 320th Street, near Auburn.  Booth drove through at least one red light, temporarily losing his pursuers.  Officers discovered him again at South 342nd Street, at which point Booth turned into oncoming traffic for a short time.  Travelling at speeds between 60 and 87 miles per hour, Booth continued on, barreling through red lights.  The pursuit continued onto Pacific Highway, where officers attempted to use "stop sticks"[1] to flatten tires of Booth's car, which failed when he veered into a parking lot to avoid them.  Booth eventually reentered the interstate, this time heading south in the northbound lanes.  The chase ended when the police successfully stopped his car with a "pit maneuver," striking the back corner of the vehicle with one of their own to cause it to rotate and stop.

Booth was arrested and charged with first degree kidnapping, felony violation of a no contact order (FVNCO), and attempting to elude a police vehicle. The matter eventually went to trial.

Jury Selection and Challenges to Prospective Juror No. 4

Before the parties spoke directly with prospective jurors, the court sent out and received answers to a questionnaire.  A number of answers from

---

[1] "Stop sticks" are devices with hollow spikes that insert into a vehicle's tires, flattening them and slowing the vehicle.

3

Prospective Juror No. 4 indicated to the court and the parties that she might be biased. When asked whether she, a relative, or a close friend had been the victim of some form of domestic violence, she disclosed that a close friend had hit his pregnant wife. When asked whether she had religious or philosophical views preventing her from remaining impartial in the case, she answered "[y]es." Asked to explain, she wrote: "If it's domestic violence or the kidnapping is of a child it might be hard to be impartial." When asked whether she could follow the law regardless of what she personally believed the law should be, she denied that she could. Asked to elaborate, she wrote, "[n]ot sure." Finally, in response to the question "[c]an you be a fair and impartial juror to both parties in this case," she responded "[n]o." Her explanation of her asserted partiality was again terse: "[n]ot sure."

The parties had the opportunity to question the jurors about their answers to the questionnaire during voir dire. At the prosecutor's urging, Prospective Juror No. 4 expanded on her experience with domestic violence: a good friend of her husband had assaulted his wife and, though the incident did not lead to criminal charges, it did result in the end of the friendship. This inspired the following exchange:

> [PROSECUTOR]: . . . Is there anything about that particular experience that causes you to be concerned about being a fair, impartial juror in this case?
>
> PROSPECTIVE JUROR [NO. 4]: Well, I—I suppose I can't really answer that question for you. I mean, yeah. Would it—would it make me think twice about—yeah. Certainly would.

The prosecutor then moved on to another prospective juror.[2]

After the potential jurors had been temporarily released, Booth's attorney challenged Prospective Juror No. 4 for cause because "[s]he seemed reluctant to affirm that . . . it wouldn't be a problem [to be fair]. . . .  [A]nd just her demeanor when she was describing it."  The trial court denied the challenge.  Booth used his first peremptory on Prospective Juror No. 4.

Excusal of Seated Jurors and Verdict

By the close of jury selection, the court and counsel had chosen 14 jurors, two of whom were to be randomly selected as alternates and dismissed at the end of trial.  Opening statements were heard on May 27, 2021.  On June 1, the second full day of trial, the court heard from Juror 14 that she had fallen and needed medical attention.  She was dismissed after the court checked with counsel off-record to ensure they had no objection.

The court opened the third day's proceedings by informing counsel that he had excused a second juror who had called in sick.  Juror 13 had reached out to the bailiff early in the morning, feeling ill but hoping his symptoms would resolve after he took a shower.  Following up later in the morning, he reported that they had not.  He did not believe the sickness was COVID-19.[3]  The court then made

---

[2] Prospective Juror No. 4 was asked just one more question during voir dire, related to a hypothetical by Booth's attorney asking how to best deal with accusations of conflict among children and how to approach proof in that context. This response was not the subject of the defense's eventual for cause challenge.

[3] COVID-19 is the World Health Organization's official name for "coronavirus disease 2019," a severe, highly contagious respiratory illness that quickly spread throughout the world after being discovered in December 2019.

the decision, without first consulting counsel, to excuse Juror 13.[4] It expressed

to counsel that because their buffer of alternate jurors had dissolved, it hoped to

finish testimony that day.

Booth's attorney objected, arguing that because trial was otherwise ahead

of schedule, he believed they could wait to see if Juror 13's symptoms resolved.

He reasoned: "I . . . want to make sure that the jury we picked . . . is the jury for

. . . Mr. Booth's case. . . . I want that juror. He's—he's also a person of color. My

client's a person of color." The court noted the objection, but emphasized that

"for all the reasons I previously stated, unfortunately, Juror 13 was excused."

Trial proceeded to verdict. The jury found Booth not guilty of the

kidnapping charges, but found him guilty of FVNCO and attempting to elude a

police officer.

Booth appeals.

ANALYSIS

Dismissal of Prospective Juror No. 4

Booth first attempts to challenge the trial court's denial of his motion to

strike a prospective juror for cause. He contends that the denial was erroneous,

required him to use a peremptory challenge to keep the juror off the case, and

therefore violated a right to the use of peremptory strikes during criminal jury

selection arising under either Washington Constitution article I, section 21 alone

or in conjunction with Washington Constitution article, I section 22. This court

---

[4] The court stated at trial, "it's a humanitarian thing to do . . . [and] in the abundance of caution, I didn't want him to get other people sick, even if it's not COVID[-19]."

6

has already determined that article I, section 22 does not, on its own, provide greater protections than its federal counterpart, the Sixth Amendment to the United States Constitution. State v. Munzanreder, 199 Wn. App. 162, 398 P.3d 1160 (2017).[5]  And Booth's attempts to locate a constitutional protection of peremptory strikes in either article I, section 21, concerning which proceedings require trial by jury, or some combination of the two articles are unconvincing. We hold that those provisions do not create a right to the use of peremptory challenges in criminal jury selection.

The Sixth Amendment and article I, section 22 of the Washington Constitution both guarantee criminal defendants the right to trial by an "impartial jury."  U.S. CONST. amend VI; WASH. CONST. art. I, § 22.  There are two means by which parties may seek to exclude a prospective juror from being seated on the final jury in furtherance of this right: for clause challenges and peremptory challenges.  RCW 4.44.130.  For cause challenges are made by a party seeking to exclude a potential juror on the basis that they are unable to serve due to bias or incapacity.  RCW 4.44.150-.190.  To exclude a potential juror for bias, the court "must be satisfied, from all the circumstances, that the juror cannot disregard [their bias] and try the issue impartially."  RCW 4.44.190.  The due

---

[5] Munzanreder responded to arguments made by an appellant who "repeatedly conflate[d] the two constitutional provision," and its own Gunwall analysis incorporates references to both.  199 Wn. App. at 172-74.  Its holding, however, is limited to article I, section 22.  Munzanreder, 199 Wn. App. at 174 ("[A]rticle I, section 22's right to an impartial jury does not provide any more protection than the Sixth Amendment.").  We therefore cannot rely purely on Munzenreder's holding in the case before us, and proceed to analyze whether article I, section 21 alone, or in combination with article I, section 22, protects peremptory challenges.

process clauses of the United States Constitution protect the use of for cause challenges. State v. Latham, 100 Wn.2d 59, 66, 667 P.2d 56, 60 (1983) (" 'Due process means a jury capable and willing to decide the case solely on the evidence before it.' " (quoting Smith v. Phillips, 455 U.S. 209, 217, 102 S. Ct. 940, 71 L. Ed. 2d 78 (1982))).

In contrast, "[a] peremptory challenge is an objection to a juror for which no reason need be given, but upon which the court shall exclude the juror." RCW 4.44.140. Unlike for cause challenges, peremptory challenges are limited in number. RCW 4.44.130 (providing three peremptory challenges to each side); CrR 6.4. They may not be used to exclude potential jurors on the basis of race or ethnicity. Batson v. Kentucky, 476 U.S. 79, 91, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986) (Fourteenth Amendment to the United States Constitution limits use of peremptory challenges); State v. Jefferson, 192 Wn.2d 255, 241-42, 429 P.3d 467 (2018) (altering United States Supreme Court's Batson framework to be more protective); GR 37 (providing still greater protections by court rule).

The interplay between the two types of challenge has changed over the years. Washington case law formerly held that a court's erroneous denial of a for cause challenge that necessitated the use of one of the defendant's peremptory challenges to keep a biased individual off the jury could be considered on appeal so long as the defendant exhausted their peremptory challenges. State v. Parnell, 77 Wn.2d 503, 508, 463 P.2d 134 (1969). This changed in the wake of the United States Supreme Court's decision in United States v. Martinez-Salazar, in which the Court held that the Sixth Amendment does not create a right to

8

peremptory challenges. 528 U.S. 304, 311-13, 120 S. Ct. 774, 145 L. Ed. 2d 792 (2000). The Court reasoned that the principal purpose of peremptory challenges is "to help secure the constitutional guarantee of trial by an impartial jury." Martinez-Salazar, 528 U.S. at 316. Therefore, "a defendant's exercise of peremptory challenges . . . is not denied or impaired when the defendant chooses to use a peremptory challenge to remove a juror who should have been excused for cause." Martinez-Salazar, 528 U.S. at 317. Instead, only when a biased juror sits on the final jury is the constitutional guarantee of an impartial jury implicated and appealable. Martinez-Salazar, 528 U.S. at 316-17. Our state Supreme Court adopted this holding and reasoning in State v. Fire, 145 Wn.2d 152, 165, 34 P.3d 1218 (2001). The court did not undertake an analysis to determine whether the state constitution might protect a right to peremptory challenges, though it did dismiss the idea in passing. Fire, 145 Wn.2d at 164.[6]

This conception of jury selection, shared by the United States and Washington Supreme Courts, understands for cause challenges as the primary

---

[6] Booth asserts that Fire's precedential value is limited because its lead opinion was a plurality opinion, but this is incorrect. The lead opinion was written by Justice Bridge and signed by Justices Alexander, Smith, Ireland, and Owens. Fire, 145 Wn.2d at 165. Justice Alexander, in addition to signing Justice Bridge's opinion, also wrote separately in concurrence, agreeing that Martinez-Salazar's reasoning should be adopted. Fire, 145 Wn.2d at 168. Four justices dissented. Fire, 145 Wn.2d at 178.

Fire has also been recently relied on by the Washington Supreme Court in more than one decision. See, e.g., State v. Yates, 161 Wn.2d 714, 747, 168 P.3d 359 (2007), abrogated on other grounds by State v. Gregory, 192 Wn.2d 1, 427 P.3d 621 (2018); State v. Schierman, 192 Wn.2d 577, 632, 438 P.3d 1063 (2018).

guarantor of a party's right to an impartial jury. It conceives of peremptory challenges as an aid to the goal of impartiality, enabling parties to correct the court's errors during the jury selection process itself rather than by appeal and retrial. It does not see peremptory challenges as an end in themselves, protected as a right. The right at issue remains the right to an impartial jury.

Booth disagrees, and contends that the Washington Constitution supports his position. To succeed in this argument and have his verdict reversed, he must show not only that one of his challenges for cause was erroneously denied but also that the Washington Constitution includes a specific right to peremptory challenges, rather than a more general right to an impartial jury.

<u>Propriety of the For Cause Challenge</u>

First, we conclude that the trial court erred in denying Booth's for cause challenge to Prospective Juror No. 4.

The circumstances in which a potential juror should be struck for cause are prescribed by statute. Among various disqualifying reasons is "actual bias": "the existence of a state of mind on the part of the juror in reference to the action, or to either party, which satisfies the court that the challenged person cannot try the issue impartially and without prejudice to the substantial rights of the party challenging." RCW 4.44.170(2) (applicable in criminal trials via CrR 6.4). If a potential juror appears to hold an opinion constituting actual bias, "such opinion shall not of itself be sufficient to sustain the challenge, but the court must be satisfied, from all the circumstances, that the juror cannot disregard such opinion and try the issue impartially." RCW 4.44.190.

10

No. 82751-1-I/11

Potential jurors are sometimes less than clear, equivocating in response to the questions they are asked as part of the voir dire process. "[E]quivocal answers alone do not require a juror to be removed when challenged for cause, rather, the question is whether a juror with preconceived ideas can set them aside." State v. Noltie, 116 Wn.2d 831, 839, 809 P.2d 190 (1991). Where an answer is not equivocal, courts presume actual bias is present if they hear "a 'statement of partiality without a subsequent assurance of impartiality.' " State v. Guevara Diaz, 11 Wn. App. 2d 843, 855, 456 P.3d 869 (2020) (quoting Miller v. Webb, 385 F.3d 666, 674 (6th Cir. 2004)). Where actual bias is present, the trial court is required to excuse that potential juror. RCW 2.36.110; CrR 6.4(c)(1).

Because the trial court is in the position observe a potential juror's demeanor and otherwise make judgments about their ability to be impartial, the Court of Appeals review a trial court's decision not to dismiss a prospective juror for abuse of discretion. Noltie, 116 Wn.2d at 839-40. "A court necessarily abuses its discretion if its decision is based on an erroneous view of the law." In re Marriage of Scanlon and Witrak, 109 Wn. App. 167, 174-75, 34 P.3d 877 (2001).

Here, Prospective Juror No. 4's statements were not equivocal. In her sworn responses to the jury questionnaire she said that "it might be hard to be impartial," denied that she could follow the law, and explicitly said "no" when asked whether she could be a fair and impartial juror. Questioning during voir dire did not rebut or soften these statements of partiality. Instead, when asked whether she had "concerns" about being impartial, she replied: "Well, I—I

11

suppose I can't really answer that question for you. *I mean, yeah.* Would it— would it make me think twice about—yeah. Certainly would." (Emphasis added.)

These are not equivocal statements. Further questioning may have elicited indications of impartiality, but no such questioning occurred, and no such indication exists from Prospective Juror No. 4. The Court of Appeals defers to the trial court's immediacy of experience with prospective jurors, but no nuance of inflection or demeanor can overwhelm the explicit meaning of this prospective juror's answers. In light of Guevera Diaz's presumption of actual bias where there is a statement of partiality without a subsequent assurance of impartiality, the trial court erred by not dismissing Prospective Juror No. 4 for cause.

At oral argument, the State argued that Prospective Juror No. 4's most direct statements of lack of impartiality—her questionnaire responses—were not as unequivocal as we read them to be. It asserted that the juror questionnaire allowed only "yes" or "no" answers to questions about bias—a fact not in the record, though supported by some of the explanatory responses given by potential jurors. It contended that Prospective Juror No. 4's "not sure" responses were meant to indicate not that she was unsure why she was biased, but were instead meant to supplant the "no[s]" she had provided.

In light of her clear statements of bias, however, we cannot read the questionnaire responses in this manner. It would be one thing if Prospective Juror No. 4 had clarified that she wrote "not sure" because the previous question limited her responses and forced a stronger statement than she actually intended. But in the absence of that sort of clear repudiation of a previous

12

answer, the answers themselves are unambiguous and subject to the usual process for rebutting the presumption of actual bias that arises as a result: further questioning. Furthermore, only two of Prospective Juror No. 4's clarifying responses were "not sure." When asked to explain the philosophical or religious beliefs she held that would prevent her from being impartial, she responded: "If it's domestic violence or the kidnapping is of a child it might be hard to be impartial." The State's argument does not address this answer.

<u>State Constitutional Protection of Peremptory Challenges</u>

Even though his for cause challenge was denied in error, Booth's use of a peremptory strike on Prospective Juror No. 4 ensured that no biased juror sat on the final jury. The question becomes whether article I, sections 21 and 22 of the Washington Constitution protect the use of peremptory challenges when selecting a jury in criminal proceedings. We conclude that they do not.

Booth contends that article I, section 21 of the Washington Constitution, alone or in some combination with article I, section 22, grants a right to peremptory challenges, meaning that the trial court's erroneous denial of his for cause challenge led to the deprivation of a substantial right. We review constitutional issues de novo. <u>State v. Jorgenson</u>, 179 Wn.2d 145, 150, 312 P.3d 960 (2013). Generally,

> [t]he following nonexclusive neutral criteria are relevant in
> determining whether, in a given situation, the Washington State
> Constitution should be considered as extending broader rights to its
> citizens than the United States Constitution: (1) the textual
> language; (2) differences in the [constitutional] texts;
> (3) constitutional [and common law] history; (4) preexisting state

13

No. 82751-1-I/14

law; (5) structural differences; and (6) matters of particular state or local concern.

State v. Gunwall, 106 Wn.2d 54, 58, 720 P.2d 808 (1986).

Here, any traditional Gunwall analysis is complicated by Booth's invocation of not just one provision, but also two in combination. We begin by looking at the first, article I, section 21 alone. It reads in full:

> The right of trial by jury shall remain inviolate, but the legislature may provide for a jury of any number less than twelve in courts not of record, and for a verdict by nine or more jurors in civil cases in any court of record, and for waiving of the jury in civil cases where the consent of the parties interested is given thereto.

It does not have a federal analogue. State v. Smith, 150 Wn.2d 135, 151, 75 P.3d 934 (2003). It therefore cannot, on its own, be easily subject to a traditional Gunwall analysis; it does not stand in contrast or comparison to any particular federal constitutional provision.[7] This does not mean that there are no principles by which to judge the scope of the rights it creates, or that the Gunwall framework is not helpful. Textual and structural analyses are still called for. And courts interpreting article I, section 21 have traditionally looked to its primary purpose: to preserve the "right to a trial by jury as it existed at the time of the adoption of the [Washington] constitution." Smith, 150 Wn.2d at 150-51. Since this inquiry aligns with the third and fourth Gunwall factors—constitutional history

---

[7] Similar rights may, of course, exist in the federal constitution nonetheless, albeit to different degrees and from different sources. From, for instance, those rights guaranteed by the Seventh Amendment of the United States Constitution, which, much like article I, section 21, incorporates portions of the common law into the Constitution: "In suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise reexamined in any court of the United States, than according to the rules of the common law." U.S. CONST. amend. VII.

14

No. 82751-1-I/15

and preexisting state law—we therefore proceed guided in large part by the interpretive framework set out in that case.

*Textual and structural analyses*: Booth relies on the first clause of article I, section 21, and particularly the word "inviolate," to argue that it functions as a general source of protection for all aspects of the right to a jury trial, including the selection process. When the first clause of the provision is examined in isolation, this may be a plausible reading. But when read together with the remainder of article I, section 21, which lists exceptions to the first clause's mandate,[8] it takes on a different hue. The provision instead appears far more concerned with whether the right to a jury is afforded in any particular type of proceeding. It does not speak directly to the process of jury selection.[9]

This impression is strengthened by comparison with article I, section 22, the second provision upon which Booth relies. It reads in relevant part: "In criminal prosecutions the accused shall have the right . . . to have a speedy public trial by an impartial jury of the county in which the offense is charged to have been committed." WASH. CONST. art. I, § 22. It has a federal analogue, the

---

[8] "The right of trial by jury shall remain inviolate, *but the legislature may provide for a jury of any number less than twelve in courts not of record, and for a verdict by nine or more jurors in civil cases in any court of record, and for waiving of the jury in civil cases where the consent of the parties interested is given thereto.*" WASH. CONST. art. I, § 21 (emphasis added).

[9] Booth cites Alexson v. Pierce County, 186 Wn. 188, 193, 57 P.2d 318 (1936) as authority to demonstrate that article I, section 21 "encompasses a right to an 'unbiased and unprejudiced' jury." That case, not citing to any constitutional provision, merely said that "[t]he right to trial by jury includes the right to an unbiased and unprejudiced jury." Alexson, 186 Wn. at 193. This vague holding does not support Booth's proposition.

15

No. 82751-1-I/16

Sixth Amendment,[10] and the protections they grant are coextensive. State v. Rivera, 108 Wn. App. 645, 648 n.2, 32 P.3d 292 (2001) (footnote analyzing section 22 and concluding no greater right exists because there is no significant difference in the text and Washington courts have "always relied heavily on federal interpretations of the right to an impartial jury"); Munzanreder, 199 Wn. App. at 172-73 (looking primarily to section 22 with occasional reference to section 21 and concluding no greater right exists). Martinez-Salazar, the federal case declining to find a right to peremptory challenges, relied on the Sixth Amendment. 528 U.S. at 311-14.

Read together, a division of responsibilities emerges. It appears that article I, section 21 governs under what circumstances a litigant is afforded the right to a jury trial while article I, section 22 governs matters having to do with selection of impartial jurors in a criminal case. In criminal proceedings, at least, the two serve complementary roles, and to incorporate article I, section 22's protections into article I, section 21 would be to interpret the former as mere surplus to the latter. As a result, the text and structure of our state constitution strongly oppose Booth's reading of article I, sections 21 and 22, whether the provisions are considered alone or together.

*Constitutional and common law history*: The drafting history of article I, section 21 is sparse and largely unhelpful as a guide to the provision's

---

[10] Which reads in relevant part: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the state and district wherein the crime shall have been committed." U.S. CONST. amend VI.

16

No. 82751-1-I/17

application. Discussion of the section at Washington's constitutional convention was limited to two objections, neither sustained. THE JOURNAL OF THE WASHINGTON STATE CONSTITUTIONAL CONVENTION 1889, at 510 (Beverly Paulik Rosenow editor1999). The first sought to require jury unanimity. THE JOURNAL at 510. The second opposed the language "nine or more jurors" as ambiguous, proposing instead "nine out of twelve jurors." THE JOURNAL at 510. The leading treatise notes only that "[i]n creating this provision, the convention borrowed from the Oregon, California, and Nevada constitutions" and from a delegate's proposed constitution. Robert F. Utter & Hugh D. Spitzer, THE WASHINGTON STATE CONSTITUTION 46-47 (2d ed. 2013).

*Preexisting state law*: Though the constitutional drafting process is not illuminating, case law is instructive as to the traditional scope of this right. See Grant County Fire Prot. Dist. No. 5 v. City of Moses Lake, 150 Wn.2d 791, 809, 83 P.3d 419 (2004) (considering post-ratification history of analysis of the Washington constitutional provision at issue). Courts have invoked article I, section 21 when: (1) guaranteeing trial by jury for offenses tried in municipal court;[11] (2) finding the right to a unanimous jury violated when the court did not instruct a jury to disregard prior deliberations when an ill juror was replaced by an alternate;[12] (3) declining to require a jury trial for proceedings under the

---

[11] City of Pasco v. Mace, 98 Wn.2d 87, 99, 653 P.2d 618 (1982) (looking to rights preserved under the territorial code but not granted at the time in the federal system).

[12] State v. Lamar, 180 Wn.2d 576, 581-83, 327 P.3d 46 (2014).

17

No. 82751-1-I/18

involuntary treatment act, ch. 71.05 RCW;[13] (4) striking down a legislative

damages cap because it invaded the traditional province of the jury;[14] and

(5) clarifying that no right to a jury trial exists where an action is purely equitable

in nature.[15] This sample is by no means exhaustive, but it captures the spirit of

the provision, which has most often been applied to determine under what

circumstances a jury trial, as opposed to a bench trial, is appropriate. It has not

been applied to regulate the process of jury selection, and Booth does not cite

any case demonstrating otherwise.

Booth does, however, point to the existence of peremptory strikes in

territorial codes preceding the adoption of the Washington Constitution to argue

that they demonstrate "Washington's commitment to providing peremptory

challenges." He argues by analogy to City of Pasco v. Mace, in which the

Washington Supreme Court held that article I, section 21 protects the right to a

jury trial in cases prosecuting " 'petty offences.' " 98 Wn.2d 87, 99, 653 P.2d 618

(1982) (quoting Callan v. Wilson, 127 U.S. 540, 8 S. Ct. 1301, 32 L. Ed. 223

(1888)). There, the court traced the history of jury trials in Washington to

determine that territorial code entitled criminal defendants to trial by jury for all

criminal offenses no matter how petty the offense, unlike the state of affairs

---

[13] Matter of Det. of C.B., 9 Wn. App. 2d 179, 183, 443 P.3d 811 (2019) (finding no sufficiently similar proceedings at the time of the state constitution's ratification, and therefore no preserved right).

[14] Sofie v. Fibreboard Corp., 112 Wn.2d 636, 652-59, 771 P.2d 711 (1989).

[15] Auburn Mech., Inc. v. Lydig Const., Inc., 89 Wn. App. 893, 898, 951 P.2d 311 (1998).

under the federal constitution at the time.  <u>Mace</u>, 98 Wn.2d at 99.  Booth asserts

that Washington's right to a jury trial likewise elevates the peremptory strikes of

the territorial code into a constitutionally protected right.

But territorial code cannot necessarily be shepherded into constitutionality.

Because the rest of our analysis understands article I, sections 21 and 22 as

working in tandem, it is not even clear that this preexisting law is relevant to

determination of article I, section 21's scope, as opposed to article I, section 22's.

<u>Mace</u> concerned the ushering into constitutionality of rights that fall squarely

within the scope of article I, section 21's remit: determining what causes of action

have their factual issues decided by a jury.  98 Wn.2d at 96-101.  Here, the code-

created right Booth asserts should become constitutional in nature does not so

clearly fall under that provision.  It more closely tracks the protections of article I,

section 22, concerning jury selection in criminal trials, which we have already

held does not provide greater protections than its federal analogue.

<u>Munzanreder</u>, 199 Wn. App. at 172-73.

Even if the territorial code did directly implicate the rights bundled together

in article I, section 21, the preexisting law it represents is just one of the <u>Gunwall</u>

factors.  It does not weigh more heavily in our analysis than the division of labor

between the two constitutional provisions.  Our textual and structural analyses,

as well as the courts' history of interpretation of article I, section 21, tend toward

understanding matters of jury selection to be governed solely by article I,

section 22 and due process.

We therefore hold that article I, section 21 of the Washington Constitution does not create a right to the use of peremptory challenges in the criminal jury selection process.[16]

The question remains whether the two provisions, when considered together, might give rise to a right—the right to peremptory challenges in criminal jury selection—that neither individually affords. We conclude that they do not.

Washington courts have occasionally swept the two provisions, or less specific reference to the jury trial right generally, into a single analysis. Where they have, they have defined the right at issue more narrowly than the umbrella right to a jury trial and looked to see whether the more specifically formulated right existed at the time of the Washington Constitution's adoption. See, e.g., State v. Clark-El, 196 Wn. App. 614, 621, 384 P.3d 627 (2016) (considering whether right to stronger protection than harmless error analysis on appeal where an essential jury instruction was not given); State v. Brown, 132 Wn.2d 529, 595, 940 P.2d 546 (1997) (considering right protecting against "death qualifying" potential jurors); Smith, 150 Wn.2d at 156 (considering right to a jury trial to consider fact of prior convictions at sentencing).[17] At times, they have

---

[16] We are not persuaded that the last two Gunwall factors, which focus on the differences between state and federal structures and interests, are relevant to our analysis in this instance.

[17] Booth relies on Clark-El and Smith in particular to establish that the Washington Constitution is more protective of the right to a jury trial than is the federal constitution. Both include statements to this effect, discussing both provisions together. Clark-El, 196 Wn. App. at 621; Smith, 150 Wn.2d at 151. Neither finds that the more specific right at issue exists. Clark-El, 196 Wn. App. at 624; Smith, 150 Wn.2d at 156. And regardless, recognition that Washington's constitution is more protective of the jury trial right than the federal constitution is necessarily correct even without holding the two provisions together create rights

20

also considered the Gunwall factors in their analysis. Brown, 132 Wn.2d at 595-98. Consideration of this sort of argument does not, therefore, require application of a different rule or set of rules than what we already used to guide our inquiry above.

Here, because the separate purposes of article I, sections 21 and 22 already weighed so heavily in our analysis of the scope of the rights under article I, section 21, and because no independent state or constitutional history has been provided, our balancing of the factors does not change. Booth contends that Parnell and the line of cases it represents, which held peremptory strikes to be constitutionally protected in Washington throughout much of the twentieth century, should be considered as constitutional history. 77 Wn.2d at 507. Parnell's influences range from Lord Coke to Chief Justice Marshall, but it does not cite to a single constitutional provision, either Washington or federal. 77 Wn.2d at 503-508. Even if its reasoning were based in the Washington constitution, it was overruled by our Supreme Court. Fire, 145 Wn.2d at 165. To incorporate it as constitutional history in our analysis would be to disregard that overruling, having the curious effect of treating repudiated case law as binding simply because it is older than the case that abandoned it. We decline to do so.

We hold that neither article I, section 21 alone, nor in combination with article I, section 22, creates a right to the use of peremptory challenges in criminal jury selection.

---

than neither individually recognizes. This is because article I, section 22 is coextensive with the federal constitution, and article I, section 21, having no analogue, is more protective.

No. 82751-1-I/22

Discharge of Seated Juror

Booth next contends that the trial court erred when it excused a seated juror who fell ill without conferring with counsel and outside of his own presence. He asserts two constitutional rights were violated by this excusal: (1) his right to the presence of counsel at any critical stage of the criminal proceeding; and (2) his right to himself be present at critical stages. Because Juror 13's ex parte dismissal was fundamentally an administrative process, we conclude that the trial court did not err.

The Sixth Amendment and article I, section 22 both guarantee the right to counsel "at all critical stages in the litigation." State v. Heddrick, 166 Wn.2d 898, 909-10, 215 P.3d 201 (2009). A critical stage is one " 'in which a defendant's rights may be lost, defenses waived, privileges claimed or waived, or in which the outcome of the case is otherwise substantially affected.' " Heddrick, 166 Wn.2d at 910 (quoting State v. Agtuca, 12 Wn. App. 402, 404, 529 P.2d 1159 (1974)). Denial of counsel at a critical stage is presumptively prejudicial and a ground for reversal on appeal. Heddrick, 166 Wn.2d at 910. As a constitutional issue, denial of right to counsel at a critical stage is reviewed de novo.

Criminal defendants also have a fundamental right, derived both from due process and the right to confront accusers, to themselves be present "at all critical stages of a trial." State v. Irby, 170 Wn.2d 874, 880, 246 P.3d 796 (2011). This critical stage analysis asks whether the defendant's " 'presence has a relation, reasonably substantial, to the fulness of his opportunity to defend against the charge.' " Irby, 170 Wn.2d at 881 (quoting Snyder v. Massachusetts,

22

291 U.S. 97, 105-06, 54 S. Ct. 330, 78 L. Ed. 674 (1934), <u>overruled in part on other grounds sub nom.</u> <u>Malloy v. Hogan</u>, 378 U.S. 1, 84 S. Ct. 1489, 12 L. Ed. 2d 653 (1964)).

We hold that a juror's excusal after being seated but before beginning deliberation is not a critical stage under either test. We are guided by the similar conclusion reached by this court in <u>State v. Turpin</u>, though the court there was concerned with a defendant's right to a public trial, not their right to the presence of counsel or to be present themselves. 190 Wn. App. 815, 821, 360 P.3d 965 (2015). In <u>Turpin</u>, "the process at issue [was] the administrative process of excusing jurors who report as ill while court is not in session." 190 Wn. App. at 821. Statute and case law both create a "continuous obligation on the trial court to excuse any juror who is unfit and unable to perform the duties of a juror." <u>State v. Jorden</u>, 103 Wn. App. 221, 227, 11 P.3d 866 (2000) (citing RCW 2.36.110[18] and CrR 6.5[19]). Pointing to this obligation, <u>Turpin</u> concluded that "[t]he court's broad discretion to administer the process of dealing with an ill juror necessarily includes making contemporaneous decisions about whether to exclude that juror." 190 Wn. App. at 822. The excusal of a juror after jury

---

[18] "It *shall* be the duty of a judge to excuse from further jury service any juror, who in the opinion of the judge, has manifested unfitness as a juror by reason of bias, prejudice, indifference, inattention or any physical or mental defect or by reason of conduct or practices incompatible with proper and efficient jury service." (Emphasis added.)

[19] "If *at any time before submission of the case* to the jury a juror is found unable to perform the duties the court *shall* order the juror discharged." (Emphases added.)

selection but before deliberation, when alternate jurors remained, was an administrative matter.

The same logic applies here. It is the responsibility of the trial court to ensure the fitness of the jury. Where it is convinced that a juror is no longer able to serve, it may take appropriate action and excuse that juror so long as deliberations have not yet begun.

Additionally, the excusal did not present the opportunity for Booth's rights to be impacted, a consideration in both critical stage analyses. The purpose of jury selection, as discussed above, is the seating of an impartial jury. Even where there is error in a trial court's ruling during voir dire, no appealable issue exists absent a showing that a biased juror took part in deliberations. Martinez-Salazar, 528 U.S. at 316-17. By analogy to that body of law, no error occurred here. The jurors who ultimately deliberated were unbiased and, as a result, no prejudicial structural error occurred.

The trial court has broad discretion over matters of trial management. State v. Dye, 178 Wn.2d 541, 547, 309 P.3d 1192 (2013). It did not abuse that discretion.[20]

Booth cites State v. Ashcroft, 71 Wn. App. 444, 463, 859 P.2d 60 (1993) for the proposition that the decision to replace a juror with an alternate "should not be made . . . without according the parties an opportunity" to object.

---

[20] The court did not err legally, but conferring with counsel before excusing a juror would have been the best practice. Input from counsel regarding the length of witness testimony and other logistical issues could provide assistance when assessing whether to dismiss an ill juror or wait to see if they recover.

24

Ashcroft, however, concerned excusal of a juror and replacement with an alternate once jury deliberations had begun, a moment in trial that directly implicates article I, section 21. 71 Wn. App. at 463; State v. Lamar, 180 Wn.2d 576, 581-83, 327 P.3d 46 (2014) (finding article I, section 21 was violated where jury was not reinstructed when juror was replaced with alternate midway through deliberation). Deliberations, likewise, are governed by explicit language in the criminal rules. See CrR 6.5 ("If the jury has commenced deliberations prior to replacement of an initial juror with an alternate juror, the jury shall be instructed to disregard all previous deliberations and begin deliberations anew."). The situation here concerns a different stage in proceedings, one in which the jury has not yet begun deliberation because the case has not yet been submitted. Ashcroft, and other precedent cited by Booth relating to replacement or jurors during deliberations, is not controlling.

Booth also points to precedent holding that communication between the court and jurors is a critical stage. As a broad statement, this is true. State v. Rice, 110 Wn.2d 577, 613, 757 P.2d 889 (1988) (concerning court replaying taped confession for deliberating jury in defendant's absence). But as the State points out, this rule applies primarily to substantive communications that could affect deliberation, not administrative matters. See State v. Yonker, 133 Wn. App. 627, 635, 137 P.3d 888 (2006) (bailiff taking lunch orders is not an improper communication).

For these reasons, we conclude that the trial court did not err in its decision to exclude Juror 13 after the jury was selected but before deliberations

began.  When alternate jurors remain, the pre-deliberation, ex parte dismissal of a seated juror who has become unable to perform their duties is not a critical stage under either a defendant's right to counsel or a defendant's right to be present.

Merger of Charges

Booth last contends that the two offenses of which he was convicted— FVNCO and attempting to elude a police officer—are subject to the merger doctrine and punishable only by the greater of the two offenses because they are based on the same act: his reckless driving.  He asserts that the trial court erred as a result when it denied his request to vacate his conviction for attempting to elude, the lesser of the two offenses.  We conclude that the two offenses do not merge.

### Due Process and Merger

The Fifth Amendment of the United States Constitution and article. I, section 9 of the Washington Constitution both prohibit a defendant's being put "in jeopardy" twice for the same offense.  U.S. CONST. amend. V; WASH. CONST. art. I, § 9.  Where a defendant is charged with and convicted of two offences arising out of the same act or transaction, the two constitutions employ similar rules to determine whether double jeopardy is implicated.  The federal "same-elements"[21] test asks whether "each offense contains an element not contained in the other; if not, they are the 'same offence' . . . and double jeopardy bars"

---

[21] See Blockburger v. United States, 284 U.S. 299, 304, 52 S. Ct. 180, 76 L. Ed. 306 (1932).

26

punishment for both. United States v. Dixon, 509 U.S. 688, 696, 113 S. Ct. 2849, 125 L.Ed.2d 556 (1993). The Washington "same evidence" test asks whether the two offences are the same in law *and* in fact. State v. Calle, 125 Wn.2d 769, 777, 888 P.2d 155 (1995). Thus, "if there is an element in each offense which is not included in the other, *and* proof of one offense would not necessarily also prove the other," double jeopardy does not prohibit punishment for both. State v. Vladovic, 99 Wn.2d 413, 423, 662 P.2d 853 (1983) (emphasis added).

The question of whether a defendant may be punished twice for the same act does not end with constitutional analysis, however. Double punishment for the same act also requires that the legislature intended that both offenses be separately punishable. In re Pers. Restraint of Burchfield, 111 Wn. App. 892, 895, 46 P.3d 840 (2002). When the degree of one offense is raised by another offense separately criminalized by the legislature, courts presume that the offenses "merge" and the defendant is punishable only for the greater of the two. State v. Freeman, 153 Wn.2d 765, 772-73, 108 P.3d 753 (2005). As an example of this class of offenses: conviction of first degree kidnapping requires proof of another felony committed as part of the kidnapping to elevate the crime to the first degree. Vladovic, 99 Wn.2d at 421.

This presumption of merger where one offense is a predicate to elevate the severity of another may be overcome, however, where there is specific indication that the legislature meant to punish the two offenses separately. Calle, 125 Wn.2d at 780. Calle found such intent in statutes punishing rape and incest because they served different purposes (protecting the family as opposed to

27

punishing unlawful sexual intercourse) and were located in different chapters of the criminal code.  125 Wn.2d at 780-81.  Alternatively, the presumption of merger is overcome and a complex structural inquiry into legislative intent is unnecessary where the legislature has expressly indicated its intent by including an explicit "antimerger" provision in a statute.  State v. Williams, 181 Wn.2d 795, 800, 336 P.3d 1152 (2014).

Application of Due Process and Merger

Here, the inquiry concerns two statutes: the former RCW 26.50.110 (2006),[22] describing when the violation of a no contact order rises to the level of a felony, and RCW 46.61.024, criminalizing attempting to elude a police vehicle. The violation of a no contact order becomes a felony if: (1) the defendant has two previous violations for violating a no contact order; or (2) the defendant commits an assault during the course of violating the no contact order; or (3) the defendant's conduct violating the no-conduct order "is reckless and creates a substantial risk of death or serious physical injury to another person."  Engrossed Substitute H.B. (SSHB) 1320 § 56(4), (5), 67th Leg., Reg. Sess. (Wash. 2021). RCW 46.61.024 criminalizes driving a vehicle in a reckless manner while attempting to elude a pursuing police vehicle after being given a signal to bring the vehicle to a stop.

---

[22] This chapter was repealed, effective July 1, 2022, by Laws of 2021, ch. 215, § 170.  For the full text of the act, which has not yet been recodified, see SSHB 1320 (Wash. 2021).  The provision about felony violations of no-contact orders may be found at Part VIII, § 56(5).

At the threshold, the State raises the question of whether, where the jury's verdict did not say on what basis the FVNCO was elevated, due process and merger are implicated at all. The jury was not given instructions about the first method by which a no-contact order violation may rise to the level of a felony: the defendant having two previous no-contact order violations. It was, however, instructed that it could find Booth guilty of FVNCO if it found that he had committed assault or that his conduct was reckless. It is unclear whether the jury found that Booth's FVNCO was premised on assault or recklessness; the verdict form did not require it to differentiate. Testimony tending to demonstrate both was elicited at trial, and both prongs were discussed during the State's closing argument. As such, though it is possible that the jury found that Booth's FVNCO was premised on acts that did not constitute attempting to elude—namely, assaulting Gaytan-Roybal by pushing her into the car—it is also possible that the jury considered the reckless driving as the act underlying both charges. Where it is difficult to ascertain which acts a jury relied on to reach its verdict and the verdict is therefore ambiguous, the rule of lenity applies and the ambiguity resolves in the defendant's favor. State v. Whittaker, 192 Wn. App. 395, 417, 367 P.3d 1092 (2016). We accordingly conclude for the purposes of our merger analysis that the same act—reckless driving—supported the jury's decision to convict Booth for both offences.

Double jeopardy is therefore implicated. We must first decide whether the "same-elements" or "same evidence" tests prohibit double punishment. They do

not. Each relevant offense included at least one element that the other did not; eluding required a pursuing police vehicle, FVNCO required a no contact order.

Next is the question of whether the merger doctrine applies. The doctrine is relevant because the same acts that constitute Booth's attempt to elude also constituted the recklessness leading to the no contact order violation's elevation to a felony. We conclude that the legislature did not intend the two offenses to merge.

First, the legislature included the following provision, formerly codified as RCW 26.50.210, in the same chapter that codifies FVNCO: "Any proceeding under this chapter is in addition to other civil or criminal remedies." SSHB 1320 § 68(1). Though the State urges the panel to interpret this provision as an antimerger clause that expressly indicates the legislature's intent to punish FVNCO offenses separately from the crimes that elevate them, the provision is notably less direct than other antimerger clauses. See RCW 9A.52.050 (Burglary antimerger provision: "Every person who, in the commission of a burglary shall commit any other crime, may be punished therefor as well as for the burglary, and may be prosecuted for each crime separately."); RCW 9A.36.080(5) (Hate Crime antimerger provision: "Every person who commits another crime during the commission of a crime under this section may be punished and prosecuted for the other crime separately."). The unclear language of SSHB 1320 § 68(1) makes reading it as an antimerger provision a stretch; antimerger provisions are, after all, meant to be explicit indicators of the legislature's intent. But it is nonetheless a general indication of the legislature's broad intent that the chapter

30

it is a part of should be construed independently of other chapters. Its existence therefore weighs slightly against merger, even if it is not dispositive on the issue. See State v. Moreno, 132 Wn. App. 663, 667-68, 132 P.3d 1137 (2006) (reasoning similarly when finding assault does not merge into FVNCO).

Second, the two offenses are located in different titles of the Revised Code of Washington, with different purposes behind their enactment. FVNCO was formerly located within Title 26 RCW, Domestic Relations, under the Domestic Violence Protection chapter. Moreno, 132 Wn. App. at 669. SSHB 1320—a comprehensive restructuring of statutes governing civil protection orders that includes the provisions creating FVNCOs—was recently passed because of the legislature's findings that "[d]omestic violence is a problem of immense proportions" and was intended to "prevent and respond to abuse" and "address significant harms impacting individuals as well as communities." SSHB 1320 § 1(1)-(3)(a). By contrast, RCW 46.61, Rules of the Road, the chapter criminalizing attempting to elude, is part of Title 46 RCW, governing motor vehicles.

Even before the passage of SSHB 1320, courts declined to find that assault offenses underlying FVNCO convictions merged with the FVNCO offenses they elevated because of the different purposes behind the domestic relations statute and the criminal code. Moreno, 132 Wn. App. 670-71. The legislature's recent reemphasis of the immensity of harm caused by domestic violence indicates an even stronger intent to punish FVNCOs separately from an underlying offense. And the location of intent to elude in the chapter governing

31

No. 82751-1-I/32

the rules of the road indicates an even more disparate purpose behind the offenses: the chapter's purpose is to ensure safe roads.

Booth contends that there is a tension in existing case law. He points to several cases indicating that assault does not merge into FVNCOs and contrasts them with cases showing that FVNCO violations merge into the offense of stalking. Compare State v. Novikoff, 1 Wn. App. 2d 166, 170, 404 P.3d 513 (2017) (finding legislature intended to separately punish assault and FVNCO), State v. Leming, 133 Wn. App. 875, 890-92, 138 P.3d 1095 (2006) (same), and Moreno, 132 Wn. App. at 670 (same) with Whittaker, 192 Wn. App. at 417 (FVNCO violations merge into stalking), and State v. Parmelee, 108 Wn. App. 702, 710-11, 32 P.3d 1029 (2001) (same). There is no inherent contradiction here, however. As noted above, merger analysis is necessarily comparative, looking at two offenses in relation to one another. One offense may merge into a second while the second does not merge into a third.

We therefore conclude that the legislature intended the two offenses to be punished separately, even when they arise from the same underlying acts.

Finding no error, we affirm.

_Smith, A.C.J._

WE CONCUR:

_Andrus, C.J._

32